Chancellor Desaussure.
The bill in this case, was filed by a creditor of Muse Tolleson, to set -aside the sale and *146 -purchases of certain slaves, furniture, lands, and dwelling house of said Tolleson, on the allegation that they were made -covinouslyt and with a view to deceive and defraud his just creditors.
The answers generally denied the frauds. But Muse Tolleson, who is the principal defendant, and upon whom the imputation of fraud chiefly lay, has been positively proved, by several respectable witnesses, not to be entitled to any credit; so we are compelled to come to the conclusion that no reliance can be placed on this defendant’s answer, in a court ofjustice.
It was objected however that it was not proper to receive any evidence to prove the want of credibility of the defendant. Tolleson, because the complainant, by putting him to his oath, gave him credit, which he was not at liberty to attack or deny; This objection, by going too far, defeats itself. It would be absurd and mischievous to admit it — and it is not the rule of the court.
Discrediting then the answer of Muse Tolleson, we are obliged to resort to other testimony, and to form our judgment on the weight of the evidence: But it was further objected by some of the counsel,. that this was a bill of discovery, which gave jurisdiction to the court; and no discovery being obtained, and the answer denying the allegations of the bill, the court was not at liberty to receive evidence to contradict the answers, and to decide on that evidence. This is surely not the doctrine of the court. Here is a bill filed, charging gross fraud t* defeat creditors. All bills in equity may be considered in some degree as bills of discovery, for they all allege facts,, and interrogate the defendants as to their truth. If the answers of the defendants, admitting or denying the charges alleged, were conclusive, there never would be any necessity for the adduction of evidence. But we know that in practice, evidence is constantly produced to contradict the answers, or to establish the facts which are not admitted by the defendants. There isr a plain rule on the subject, which is, that the defendant’s answer, if he is not proved to be utterly unworthy of credit, shall have so much weight attached to it that it shall be considered as establishing the truth to what it states, in answer to the *147 allegations of the bill, unless contradicted by two witnesses, or by one witness and strong circumstances. The very existence and continual application of this rule is decisive against the assumption, that because bills in equity demand information from the defendants on their oaths, their answers are therefore to be considered as conclusive, and exclusive of all other testimony. I' have made these remarks, because it appears that there has been a misconception on this subject, which ought to be rectified.
in the case we are considering, the answer af the defendant,, .Muse Tolleson, must therefore be put out of the case, because Witnesses of indisputable credit, have attested to his entire want of credibility. The answers of the other defendants will have their due weight. The mass of evidence was so great, that it would be tedious, and it is unnecessary to state it fully in detail.
It is sufficient to state, that at the hearing of the case, the' complainant, after the production of the evidence, gave up his liens and claims as a creditor, on the slaves purchased by M'Bride, named Dan, Walter, and Joe, and indeed to all the property sold as the property of Muse Tolleson, except the following:
The slaves, Ben, Sarah and her child, Cooper, and Chloe and her child, and to the furniture; and to the house in the 'Willage of Spartanburgh, and the lands in the country: — Also, as to a store of goods said to be sold to Holder. These then form the only subjects of litigation, requring the judgment of the court.
Upon a careful examination of the evidence, it appears to me that these slaves must be decided to be the property of Muse Tolleson, and subject to his debts. Those to whom thej' were knocked down at the sales were not always participators, or even conscious of the frauds intended; but as they were induced to become purchasers and to convey the properly back to Mr. Holder, a man of no property, who does not pretend to claim them, or to the children of Muse Tolleson, who , famished the money himself for the payment, fas appears by *148 the weight of .testimony) I am bound to consider these transactions as fraudulent and void as to creditors; more especially, as the slaves remained in possession of said Tolleson, or at his dis~ posal.
This opinion has been formed notwithstanding the attempts to prove that the slaves in question were purchased for the children of Muse Tolleson, and paid for by funds and money, not the property of said Tolleson, but derived from other sources. The great weight of testimony is, that the money ap - plied to the payment of these slaves was Muse Tolleson’s, The presumptions attempted to be set up, of a sufficient fund for the children of Muse Tolleson, being applicable to and actually applied to these purchases, are not supported by sufficient evid' nee to establish that. Thomas Dare testifies that he never, paid any money on his bond to the children of Muse Tolleson, and there is no evidence of any other fund.
We come now to the consideration of the furniture: most of these articles were purchased and paid for by Mrs. Tolleson, in her own name, or by her daughter Missouri, or by Miss Chandler for her, or by others. The only question is from what source the payments were derived? If Mrs. .Tolleson had separate funds, bona fide her own, or was supplied by friends with them, to pay for those articles of furniture, then she may be protected in the enjoyment of them; if not, they musí bo considered the property of her hushand and liable to his debts. It was contended on her behalf that she was created a sole, dealer, by deed, on the 1st May, 1823, and that her purchases of furniture at sheriff’s sales were made subsequent thereto, and that she had separate funds from her husband, which she had applied to.pay for the articles she had purchased.
The right of the husband to appoint his wife a sole trader and dealer was questioned by the counsel for the complainant; and it was also insisted that there was no proof of her having earned any separate estate which she could apply t& this purpose.
The statute of 1744, (being the 10th section of the at-tsctaeni-acR) see Grimke’s Pub. Law, p. 190, is the only *149 provision made by our laws respecting wives being made sole traders. That statute does not create or give a right to bus-bands to make their wives sole traders, but it recognizes such a right as then existing and in use, and makes provision against the abuse; and the usage thus recognized and guarded has continued ever since. It cannot therefore be denied that Muse Tolleson had a legal right to constitute his wife a sole trader; and his doing so by deed on the 1st May, 1823, is not vitious. If not a regular creation of her, it is a sufficient recognition of her in that character. Her acts are however open to examination, and she shall not be made the instrument by which her husband may commit frauds on otlier persons. He shall not be permitted to pour his private funds into her purse, and pro* tect them from his debts by calling them her separate estate. She must shew, when called upon, how she has acquired a separate estate. In the case we are considering, Mrs. Tolleson was not made a sole trader till her husbands affairs were deeply embarrassed, and only a few months before the total breaking up of his affairs. It is not. shewn that she pursued any separate business or trade, by which she could acquire a separate estate, Itis therefore the highest presumption that she had no separate funds of her own, as a separate estate.
But it is said there was a separate fund due to Missouri Tolleson, the daughter, applicable to this purpose, which was so applied. This consisted of a bond of Thomas Dare and John Tolleson, to their grand-daughter Missouri Tollison,.for $ 500, when she should attain the age of twelve years. But Dare swears that he has never paid any money on the bond, and Mr. Benson swears that John Tolleson told him he had signed the bond to draw in old Dare to sign it, but that he was not to pay it, and that he had a counter bond from Muse Tolleson.
It was also urged that John Holder and Miss Chandler had made some of the purchases and paid for them for Mrs. Tolle-son, and also John Kirby; but John Kirby swears that Mrs. Tolleson paid him the money, and it was distinctly proved that neither Holder nor Miss Chandler were in funds of their own, or capable of paying for these articles. The result is, the# we *150 aro reluctantly compelled to come to the conclusion that all the funds which were applied fo make these payments were Muse Tolleson’s, consequently the articles purchased were hi.e and liable to his debts, I come reluctantly and painfull}7 to this conclusion, as I should be glad that this unfortunate family had some plank on which to swim; and it would be an act of kindness in the creditors to allow the innocent members of the family some of the articles which are indispensable to their comfort and subsistence.
We came now to the consideration of the land- and houses, conveyed by Mdse Tolleson to Berryman Holder and his heirs,, by deed bearing date the 1st March, 1822, in consideration, as stated on the face of the deed of $20,000. The deed, upon its face purports tabean absolute conveyance in fee;, but Holder admits that it was intended merely as a mortgage, to secure him the payment of sundry sums of money winch he alleges to be due him, among which- were two security debts; one to Mr.. Weyman and the other to. McMülan. The land has been sold under a judgment of Weyman against Muse Tolleson, and bought for Mr. Weyman. Holder claims the payment of the money arising from the sales, or that the sales should be set aside.
It was insisted for the complainant that ás the absolute con-veyancé by Tolleson to Holder, was a fraud to cover the property of Tolleson from his creditors, that the conveyance ¿should be considered null and void, and the property subjected to the debts of Tolleson, leaving Holder to bis remedy against Mm for any just demands that lie may really have. It appears to me that this would be going too far. Prior to judgment, Tolleson had a right to secure Holder for all that was justly due to him, and the deed ought to be considered a security tc that amount. What that is, cannot be decided without a reference to the commissioner to examine and report upon all the-various claims of Holder against Tolleson, either for services rendered or as Security for Tolleson, for sums paid by him or for which he is. liable, taking care to examine and report on the payments and discounts*
The case was argued by Irby, J. W. Farrow, A. W. ^Thompson and Clendenin, for the several appellants, and by W. Thompson for the respondent.
The argument related chiefly tó the evidence.
Some question was made about the execution oí' the deed, the regularity or fairness of which was questioned. The circumstances were obscure and raised'sorne doubt] but upon the whole, lam satisfied that the deed was duly executed, and intended to be a security to Holder. Another question arose as to the sale of a store of goods by Muse Tolleson to Holder. The evidence appears to establish that this sale was fictitious, and intended as a coyer to protect the goods for Tolleson.
The last question regards the costs. With respect to Muse Tolleson, Holder, and those who combined with him to defraud his creditors, undoubtedly costs should be decreed. There are defendants however who do not appear to have been blamed worthy in these transactions, and the suspicions of the complainant, though colorable, .would not justify giving costs against them. '
The decree ivas that the' property which appeared to have been purchased with Tolleson’s funds should be made liable for his debts] that Holder should be charged, with ‡ 24,000, on account of the creditors of Tolleson ('having received debts and goods of Tolleson to that amount) and that the conveyancetd him should stand only as a security for his claims on Tolleson, of date previous to complainants execution;
From this decree the defendants appealed on the various grounds involved in the case.
Chancellor Gaillard.
»We have considered this case, and are satisfied that the transactions of Tolleson and his coadjutors, were tainted, generally, with fraud: and the decree must be .supported, as far as it decides against the defendants: But we are of opinion thai the decree did not go far enough. It orders that the deed made by Tolleson, conveying his lands to Holder, for the nominal consideration' of twenty- thousand dollars, should stand as a security for such balance as might bo found bona fide, due by Tolleson to Holder.
*152 The court is of opinion, that although there might be something due by Tolleson to Holder, the latter is not entitled to the benefit of the conveyance as a security for what may be found due; because the deed, making an absolute conveyance of the land by Tolleson, for a large nominal price, was intended as a fraud, to cover his property from his creditors; and as Holder, lent his name to this fraud, he ought not to derive any benefit from it. That deed must therefore be considered void, and Holder must be left to pursue his remedy against Tolleson, if there be any thing due to him; which is at least doubtful. Should he choose to pursue his remedy, he may be at liberty to go into the proof of the actual value of the store of goods purchased by him from Tolleson, and of the debts due.
It is therefore ordered and adjudged, that the decree of the circuit court be affirmed; except so far as the same orders the absolute deed from Tolleson to Holder of the land, to stand as a security for what might be found due by Tolleson to Holder; which is hereby reversed, and the said deed declared fraudulent and void.
It is also ordered, that if Holder chose to pursue his claim against Tolleson, that he shall be at liberty to go into proof of the real value of the store purchased by him from Tolleson, and of the amount of debts due to said store, and assigned to him.
Chancellors Thompson and James concurred.
I concur with the decree of the court, except with respect totlíé deed by which Tolleson conveyed his land to Holder absolutely. It appears to me that the decree of the circuit court, ordering that instrument to stand as a security for what mightbe ascertained to be justly due by Tolleson to Holder, was correct. If it had been a mere naked fraud, I should concur in the opinion that the deed ought to be wholly set aside. But Holder really had claims on Tolleson, and as he did not claim the land under the absolute deed, but declared openly that he held it merely as a security, and would relinquish and re-convcy the land whenever his just demands should be ascertained and .satisfied, I think be is entitled to. the benefit of this conveyance, *153 as a security for his just demands; so far however as was consistent with the prior liens of other creditors. It strikes me that this case comes within the distinction made by Chancellor Kent, in the case of Boyd, vs. Dunlap, 1 Johns. C. C. 478, between deeds wholly voluntary and fraudulent, and those which are founded on some consideration, though very inadequate. There are however, I admit, some decisions which go further, and perhaps justify the court in setting the deed aside altogether.
Henry W. Desaussure-~